### THE ST. JOHNS.

In re CENTRAL R. CO. OF NEW JERSEY (SEA INS. CO. et al., Interveners).

(District Court, S. D. New York. April 24, 1900.)

1. ADMIRALTY JURISDICTION — CONTROVERSY BETWEEN CLAIMANTS TO FUND IN COURT.

A court of admiralty, which has in its possession a fund arising from the sale of a vessel in proceedings for limitation of liability for collision, has jurisdiction to determine conflicting claims to such fund between the owners of the injured vessel and her insurers, who claim to be subrogated to their right to the fund by reason of having paid a policy of insurance on the vessel.

2. MARINE INSURANCE—ABANDONMENT OF VESSEL TO INSURER.

The collection from an insurance company of the full amount at which a vessel was valued in the policy, on account of injury by collision, does not import an abandonment of the vessel by the owners to the insurer, where she was undervalued in the policy, and the owners refused to abandon. Abandonment must be the voluntary act of the insured.

3. SAME—PAYMENT OF LOSS BY COLLISION—SUBROGATION TO DAMAGE CLAIM.

The right of subrogation in favor of marine insurers on payment of a loss resulting from collision, whether partial or total, is independent of any abandonment, and exists without it.

4. SAME—VALUED POLICY—CONCLUSIVENESS ON PARTIES.

Where a vessel is valued in a marine policy, neither party can be heard to allege a different valuation, whereby the rights, remedies, or liabilities of either can be prejudiced; and, on payment by the insurer of the full amount of such valuation on account of loss of the vessel by collision, the owner cannot allege a larger valuation, uncovered by insurance, for the purpose of entitling him, as constructive insurer of such uninsured excess, to a fund recovered from the wrongdoer, to which the insurer would otherwise be entitled by subrogation.

5. SAME—DAMAGES RECOVERED FOR COLLISION—PRIORITY OF CLAIMS TO FUND.

The right of subrogation of an insurer, who has paid a policy on account of collision, to a fund recovered from the wrongdoer, is subordinate to the rights of damage claimants against the injured vessel, growing out of the collision, where she has been surrendered by the owner in proceedings for limitation of liability.

In Admiralty. On distribution of fund recovered as damages for collision, as between the owners and the insurer of the injured vessel.

Shipman, Larocque & Choate, for interveners.

Benedict & Benedict, for the Catskill, opposed.

BROWN, District Judge. This controversy arises between the Sea Insurance Company and the owners of the passenger steamer Catskill as respects the sum of $7,073.06, the remnants and surplus of the proceeds of the sale of the steamer St. Johns in the above pro-

ceedings for limitation of liability, after the payment of the claims against her for loss of life, injuries to person and damage to the property of third persons, as provided for by the decree adjudging the St. Johns and the Catskill both to blame for a collision on the Hudson river on September 15, 1897. 92 Fed. 1010; 95 Fed. 700. The fund in question remains in the hands of the trustee appointed in the St. Johns proceeding for limitation of liability. The fund is claimed by the owners of the Catskill because it is less than the unpaid moiety of the damage and loss sustained by the Catskill by reason of the collision. The Sea Insurance Company claims to have become subrogated to the Catskill's rights in the fund through the payment in full of the sum of $20,000 insured by that company upon the Catskill by a marine policy in which the steamer was valued at the same sum. The fund being subject to the disposition of the court, the court would have jurisdiction to determine the rights of the conflicting claims of title thereto, even if the claims sprang from nonmaritime contracts (Andrews v. Wall, 3 How. 568, 572, 11 L. Ed. 729; The J. E. Rumbell, 148 U. S. 1, 15, 13 Sup. Ct. 498, 37 L. Ed. 345); here the right of subrogation, if it exists at all, is a legal incident and part of the maritime contract of insurance (Andrews v. Insurance Co., 3 Mason, 6, Fed. Cas. No. 374); and on both grounds it is the duty of the court to determine to whom the residue of the fund belongs.

The policy of the Sea Insurance Company was dated April 27, 1897, and insured the Catskill in the sum of $20,000 for one year against loss or damage by collision and other risks of navigation, the value of the steamer being also fixed by the policy at $20,000. In September following the Catskill was sunk by collision in mid river and shortly afterwards raised by the Merritt & Chapman Derrick & Wrecking Company and towed to Hoboken. Some repairs were there put upon her, for which she was libeled in admiralty by the shipwrights in the district of New Jersey and sold under a decree, netting over and above the repair bill and costs and expenses of the sale, the sum of $747.62. No other claim being filed in that court to these moneys, the owners of the Catskill petitioned therefor, and by order of the court received, less expenses, the balance of $734.83 on December 15, 1897.

On October 22, 1897, the assured served notice of the loss upon Chubb & Sons, agents of the insurers, stating the fact of the collision and that the Catskill had been "damaged to an extent far exceeding the amount for which she was insured"; and that she had been libeled in the district of New Jersey and was about to be sold by the United States marshal. In the ensuing correspondence the insurers expressed their readiness to pay the whole amount of the policy upon an accounting for the salvage and an assignment of all rights of recovery against the St. Johns. The assured replied that their loss was much greater than the policy value; that they had not abandoned and should not do so, and that they would not transfer any of their rights in the wreck or its proceeds or against the St. Johns. Neither party being willing to waive these conditions, early in January, 1898, suit was brought by the assured against the

insurers in the state court, and on the 27th of January, judgment having been obtained by default for the amount of the policy, less $200 deducted according to its terms in lieu of average, the judgment was paid by the insurers and canceled of record.

Several months before, on October 5, 1897, the Catskill Company as owner of the Catskill, filed its petition in this court for a limitation of its liability arising out of the collision. Eighty-five cents was paid into court, representing the prepaid freight, and upon a subsequent reference to a commissioner to make an appraisement of the value of the wreck of the Catskill, the company acknowledged its receipt of the sum of $734.83 aforesaid, but proved by its witnesses that the bill of the Merritt & Chapman Derrick & Wrecking Company for salvage services rendered to the Catskill would be reasonably worth more than that surplus, and the company was therefore allowed to retain said surplus on that account, and the vessel was reported a total loss. On January 20, 1898, the Central Railroad Company of New Jersey, owner of the St. Johns, in consequence of several suits for damages, also filed its petition for a limitation of liability, and surrendered the vessel to a trustee appointed by the court by whom she was sold, and the proceeds, amounting to $23,944.52, were retained in his hands subject to the order of the court. In each proceeding the petition alleged the collision to have occurred without the fault or negligence of its own vessel; and in each, answers were interposed contradicting that contention. The causes were tried together, each was held to blame as above stated, and the amounts due the claimants were determined. Out of the proceeds of the St. Johns in the trustee's hands, the various claims for loss and damage have been paid, except for the damage done to the Catskill, leaving as first above stated, the sum of $7,073.76, the subject of the present controversy.

In the St. Johns proceeding for limitation of liability, the owner of the Catskill filed its claim against the St. Johns for the sum of $60,000, its alleged damages from the sinking of the Catskill. The commissioner to whom the claims were referred, found that the Catskill had been a total loss, and fixed her value at the sum of $48,719.66. The damage to the St. Johns was slight, so that upon an equal division of the entire damage (The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, Adv. S. U. S. 595, 44 L. Ed. ——), the balance remaining would be payable, as between those two vessels, to the owner of the Catskill.

On May 9, 1899, some two months after the trial and decision holding both the Catskill and the St. Johns in fault, the Sea Insurance Company upon its petition was granted leave to intervene in the proceedings in the St. Johns limitation proceedings, for its own interest in the claim of the Catskill Company for its damages against the St. Johns, and a year previously it had filed notice of its claim thereto; and thenceforward the insurance company participated in the litigation, both as respects the proof of the amount of claim in behalf of the Catskill before the commissioner, and also in the determination of the amount of damages to be awarded to the various other damage-claimants out of the fund. 95 Fed. 700. Upon the

latter hearing the question was reserved as to the party to whom the balance of $7,073.06 should be paid; and this hearing is upon the question so reserved.

1. If the title to the moneys in question depended upon any voluntary abandonment of the Catskill to her insurers, the latter plainly could not succeed. For it is manifest from the correspondence, that abandonment was expressly and persistently refused by the assured. Abandonment, it has always been held, must be the voluntary act of the assured. The demand and receipt of the full amount of the policy value on a policy undervaluing the ship does not of itself import any abandonment. It has been expressly held by the house of lords that in such a case the owner may repair and retain his ship, and recover of the insurers for the repairs up to the full policy valuation. Aitchison v. Lohre, 4 App. Cas. 755. This rule is of great importance on largely undervalued policies, since otherwise on partial losses the assured would often be unable to recover his full insurance without a sacrifice of the ship. There is no doubt that the damage to the Catskill in this case was much greater than the insurance and the fund in question combined, so that no question of strict abandonment here arises.

The title of the insurers, if any, must rest, therefore, upon their claim to subrogation to the right of the Catskill Company against the St. Johns or her proceeds through payment of the full policy value, independent of any abandonment express or implied, and notwithstanding the intent and endeavors of the assured to retain this claim for their own indemnity. The right of subrogation, though often treated as merely one of the consequences of an abandonment to insurers, is in reality in some important respects essentially different. The Potomac, 105 U. S. 630, 26 L. Ed. 1194. Abandonment proper is a transfer of some remnants of the subjects of insurance, whether ship, cargo or freight; subrogation includes rights of action against third persons liable for the same loss. Abandonment, therefore, is not necessary when the loss is actually total, nor can abandonment be made unless the loss is at least constructively total; subrogation, on the other hand, arises without reference to these conditions, and whether the loss is large or small, and whether partial or actually total. Abandonment is never obligatory upon the assured, but operates only as a voluntary transfer of title; subrogation works in invitum, by operation of law, from the mere act of payment of the loss, whether the loss is total or partial; and so far from depending on any voluntary act of the assured, the latter cannot invalidate or destroy it, without becoming answerable to the insurer for the loss. Insurance Co. v. Storrow, 5 Paige, 285; Connecticut Fire Ins. Co. v. Erie Ry. Co., 73 N. Y. 399; U. S. v. American Tobacco Co., 166 U. S. 468, 474, 17 Sup. Ct. 619, 41 L. Ed. 1081; Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 320, 6 Sup. Ct. 750, 1176, 29 L. Ed. 873; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 235, 11 Sup. Ct. 554, 35 L. Ed. 154; Clark v. Wilson, 103 Mass. 224.

2. The contract of insurance being a contract of indemnity only, insurers on payment are subrogated to the rights of the assured to any

other remedies for the same loss. The question may arise whether such remedy over is the primary obligation, as respects the insurers, as in one of the earliest cases before Lord Mansfield, where the liability of the hundred for a loss by fire being found to be the primary liability, the insurers were upon that ground held entitled by subrogation, upon paying the loss, to maintain an action for their own recoupment in the name of the assured against the hundred. Mason v. Sainsbury, 3 Doug. 61. To the same effect are Clark v. Inhabitants of the Hundred of Blythine, 2 Barn. & C. 259; Pentz v. Receivers, etc., 9 Paige, 568; Hart v. Railroad Corp., 13 Metc. (Mass.) 99; Hall v. Railroad Co., 13 Wall. 367, 20 L. Ed. 594; Clark v. Wilson, 103 Mass. 219. See Darrell v. Tibbitts, 5 Q. B. Div. 560. Where, on the other hand, the outside liability is made superior to the rights of insurers, there is no such subrogation. Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 321, 6 Sup. Ct. 750, 1176, 29 L. Ed. 873; Wager v. Insurance Co., 150 U. S. 99, 108, 14 Sup. Ct. 55, 37 L. Ed. 1013.

Yates v. Whyte, 4 Bing. N. C. 272, is a leading case to the same effect in the law of marine insurance, where after payment by insurers of a partial loss on a vessel damaged by collision, an action in the name of the assured was upheld against the wrongdoer. This has been followed by a multitude of similar cases, where it is held that if the assured recover before payment by the insurers, the recovery stands as a credit against the insurance; if recovery is after payment by the insurers, the assured holds it as trustee for the latter. 2 Phil. Ins. §§ 1723, 1724; 1 Pars. Mar. Ins. pp. 2, 551; 2 Pars. Mar. Ins. pp. 492–499, and notes. See Lown. Ins. § 215; The Potomac, 105 U. S. 630, 634, 635, 26 L. Ed. 1194; Simpson v. Thompson, 3 App. Cas. 279, 292; U. S. v. American Tobacco Co., 166 U. S. 468, 474, 17 Sup. Ct. 619, 41 L. Ed. 1081.

These general principles are not contested. The only question is concerning the application of them in a case where the actual loss is from two to three times the amount at which the vessel was valued in the policy. The inquiry then is whether the owner must lose not only what was uninsured, but all benefit of his remedy over against the wrongdoer as well. This vessel, it is said, was worth $60,000 instead of $20,000; and if the insurers are allowed this fund of $7,073.06, the result will be, that the assured upon a loss of $48,700 will recover but $19,800 and lose nearly $29,000; and though the insurers were paid for an insurance of $20,000 they will in fact through this recoupment lose less than $13,000. These considerations, however, cannot enter into a legal decision of a question like the present. The spes recuperandi is a long-settled and well-known incident of insurance, and forms part of the contract.

3. Upon losses by collision wholly through the fault of another vessel, the insurers ought by the very nature of their contract of indemnity to find a complete recoupment in their remedy over against the wrongdoer; and except where the assured undervalues his vessel in the policy, he suffers no loss thereby. He cannot complain in such a case that the insurers through recoupment have suffered no loss. If then, for his own supposed advantage, the owner insures

the ship at a large undervaluation, by what equity can he claim that the rule ordinarily applied and known to belong to the contract of insurance, should be modified in his favor to save him from a part of the loss caused by the undervaluation alone?

The assured having agreed upon the value of the ship in the policy of insurance, in effect now asks the court to take notice that the ship was actually worth much more, and that he has a large interest uncovered by the policy, of which he is virtually the insurer. If this recognition could be granted, the assured would at most be entitled to share pro rata with the insurers in the fund in question, the same as any additional actual insurers would share in it, had additional policies been taken out up to the actual value of the vessel, and her full value declared in all of them, or had they all been open policies (see The Potomac, 105 U. S. 630, 635, 26 L. Ed. 1194, per Gray, J.; Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 321, 6 Sup. Ct. 750, 1176, 29 L. Ed. 873; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 235, 11 Sup. Ct. 554, 35 L. Ed. 154). But in that case the assured would be obliged to bear, as constructive insurer, the same proportion of the original loss; the final result of which in this case would be that upon a valuation of $60,000 the insurers on paying one-third of the damage to the Catskill, i. e. about $16,250, and recouping one-third of the fund in question, would sustain a loss of a little less than $14,000, a difference only of about $1,000, or much less than might at first be supposed.

But I know of no principle of law or equity, by which the owner upon a settlement under a valued policy can be heard to allege a larger valuation of the ship uncovered by insurance, for the purpose of letting him in as constructive insurer, so as thereby to share in another remedy for the same loss to the insurer's prejudice. If the owner makes any claim upon the insurer under the policy, he must abide by its terms. The valuation stated in the policy is a part of the basis of the contract. It is a very material condition affecting in various ways the rights and liabilities of both parties. The premiums paid are presumably in part at least based upon it. Both parties are, therefore, equally bound by the valuation, and neither can change the contract in this respect, or the legal rights springing from it, without the other's consent. The Potomac, ut supra. But to open the valuation for the purpose above stated, would manifestly be to reject the contract as made, and in place of a valued policy to substitute an open one to the detriment of the insurer. This is never permissible, except upon some grounds of mistake or fraud, which here do not exist. To grant the contention of the assured would not only materially change the contract, but reopen the doubtful question of value, which it was one of the objects of the agreement on value to foreclose. Irving v. Manning, 6 Man., G. & S. 391. Neither party, therefore, can be heard to allege a different valuation whereby the rights, remedies or liabilities of either can be prejudiced.

If the amount recoverable from the wrongdoer, after payment of the damage-claims of third parties, were in excess of the amount paid by the underwriters to the assured, no doubt that excess would

belong to the latter; since the insurer's right of subrogation in equity could not extend beyond recoupment or indemnity for the actual payments to the assured. As was stated by Mr. Justice Gray in St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 235, 11 Sup. Ct. 557, 35 L. Ed. 157:

"In fire insurance, as in marine insurance, the insurer, upon paying to the assured the amount of a loss of the property insured, is doubtless subrogated in a corresponding amount to the assured's right of action against any other person responsible for the loss."

Where there has been an actual abandonment to the assured, however, the result might be different; since an abandonment, operating as a transfer of title, might possibly include the whole right of recourse against third persons. If so, that would constitute another distinction of some importance, between abandonment and subrogation. But in this case the sum recoverable from the St. Johns being insufficient to recoup the insurers for their payment upon the policy, the owner under the agreed valuation has no standing to assert any claim to that fund in his favor until the insurers' claim is satisfied.

The right of the owner to be treated as constructive insurer of any uninsured excess of value above that stated in the policy, was involved in the recent case in this court of International Nav. Co. v. Atlantic Mut. Ins. Co. (D. C.) 100 Fed. 304, although the interests were there reversed. In that case the St. Paul was valued and insured at one-third less than her value; upon stranding, certain salvage charges were incurred and paid by the owner, and on suit therefor against the insurers the latter claimed that the owner should bear one-third of the salvage charge as constructive co-insurer by reason of his uninsured one-third interest in the vessel. In the similar case of Providence S. S. Co. v. Phœnix Ins. Co., 22 Hun, 517, the appellate division had allowed the insurers a ratable deduction on that ground; but this was reversed in the court of appeals (89 N. Y. 559) because the insurers were there held estopped from setting up this claim by the valuation in the policy. And upon the same view this court held that the insurers of the St. Paul must bear the whole salvage charge, being estopped from alleging that there was any uninsured interest in the vessel bound to share the loss with them. Amid some conflicting decisions, it was there considered that the sounder opinion at the present day is, that as respects all matters affecting the measure of compensation or the rights of either party growing out of the insurance contract, the valuation fixed by the policy operates as an estoppel upon both parties alike. There the estoppel was in favor of the assured, here it operates to the advantage of the insurer; but the same rule is applied to both. 3 Kent, *274; Irving v. Manning, 6 Man., G. & S. 391; Insurance Co. v. Hodgson, 6 Cranch, 206, 3 L. Ed. 200; The Potomac, 105 U. S. 630, 635, 26 L. Ed. 1194. The question is substantially the same that arose in the case of Association v. Armstrong, L. R. 5 Q. B. 244, where the vessel insured was sunk and totally lost by collision, being worth £9,000, but insured and valued in the policy at only £6,000; nearly the whole amount of the insurance having been

recovered and paid into court, by action against the owners of the other vessel, as solely in fault for the collision, the question submitted to the court was, whether the insurers, having paid the whole amount of the policy, were entitled to the whole proceeds in court, or whether the insured owner was entitled "to participate in the amount recovered, or any part thereof." The court held the insurers entitled to the whole. In delivering judgment Cockburn, C. J., says (page 249):

"It has always been considered as a settled rule in insurance law, as I started with observing, that where there is a total loss the underwriters, who pay upon a total loss, whether it is actual or whether it is constructive, are entitled to anything that remains of the vessel, and to anything which would otherwise have accrued to the owner of the vessel by reason of his ownership. Where the policy is an open policy, and simply a policy of indemnity as to the actual value of the vessel, no difficulty would arise in such a case as this. It is only because it is a valued policy that these difficulties present themselves. I think we must still apply the old rules, and not make new; and if a party chooses to have his vessel or his goods, as the case may be, taken at a fixed value, instead of leaving the contract, as in an ordinary policy, simply one of indemnity to the extent of the real value, and if thereby any benefit accrues to the underwriters, the underwriters must be entitled to it."

Mellor, J. says:

"I am of the same opinion. I think Mr. Smith fairly states the question which determines the matter, viz., what is the effect of the agreement as to the value? The basis of the contract is the agreed value of the vessel, and when, to avoid all questions as to the real value, the parties come to an agreement as to the value, it appears to me to follow as a matter of course that all those rights, which spring out of the payment by an underwriter for a total loss, must be governed by the agreed value."

Lush, J., says:

"A person effecting an insurance may either agree upon the amount which is to be considered as the sum forming a complete indemnity, or he may leave it open. If he fixes the amount which he is to be paid in the case of a total loss, and the underwriter accepts that amount, then that amount must be binding upon both parties. If each of the parties agrees that a certain sum shall be deemed to be the value of the thing insured, the underwriter, in the case of a total loss, is not to be at liberty to say the thing is not worth so much; he is bound to pay the amount fixed upon, whether it is the proper amount or not. And, on the other hand, the assured is not at liberty to say it is worth more; he is bound by that amount. It is for the purpose of avoiding all question about the value that the parties agree to fix that amount, and for all purposes, therefore, of adjusting the rights under that policy both the parties are bound by that value."

The decision in that case has been repeatedly cited by the supreme court with apparent approval and to some extent followed. The Potomac, 105 U. S. 630, 634, 26 L. Ed. 1194; Railway Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527.

The only point in which the Armstrong Case differs from the present is, that the loss there was apparently total; while here the truth seems to be that the loss of the Catskill was not total, though the legal proceedings have been such as to make it appear so. She was sold in admiralty, and netted less than a fair salvage compensation for raising her; and on that ground she was reported a total loss in her proceeding to limit liability. In her proof of claim against the St. Johns, she was again reported as a total loss. Yet the record shows that at the admiralty sale she was bought in by a third per-

son with the money of her former owners and on their account; that she was subsequently repaired at an expense of $21,127.57 and is now running. In the Case of Armstrong no express mention of abandonment is made; but some of the language in the opinions, particularly in that of Lush, J., seems to assume a situation of abandonment, which might include the right of action against the wrongdoer. Here there was no intention to abandon anything. The owners had the right to keep and repair the Catskill and still recover the full amount insured, without any abandonment, the same as upon a partial loss. But I do not perceive how this circumstance can make any difference as respects the insurers' right of subrogation, as in any other case of partial loss; or how it can affect the nature of the estoppel arising from the valuation in the contract. So far, therefore, the insurers are entitled to recover.

4. It is further urged that by reason of the insurers' laches and inaction in the litigation brought to establish the liability of the St. Johns for the collision, they should be held to have forfeited their right to the fund thereby secured. The cases cited in support of this doctrine (The Saracen, 6 Moore, P. C. 73; Woodworth v. Insurance Co., 5 Wall. 87, 18 L. Ed. 517; Insurance Co. v. Corcoran, 1 Gray, 75; The Battler [D. C.] 67 Fed. 251; Newcomb v. Insurance Co., 22 Ohio St. 382) seem to rest on peculiar circumstances and not to be fairly applicable to the present case. Here the owners of the Catskill cannot plead any surprise. The insurers had claimed the benefit of any recovery against the St. Johns from the first. Though the liability of the St. Johns was doubtless the first thing to be established, the reduction of the damage claims against both vessels, was equally important; and in that litigation the insurers took their fair share of the work. All the damage claimants also took part in establishing the St. Johns' liability. Considering, however, the uncertainties and difficulties of the situation, and that the benefit of the original establishment of the liability of the St. Johns is due to a very considerable extent to the attorneys and counsel of the Catskill, though not wholly to them, I think an allowance should equitably be made to the attorneys and counsel of the Catskill for their services in the recovery of the fund.

The right of the insured owner, upon a surrender of his vessel in proceedings to limit his liability, to retain the insurance moneys for his own benefit (City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134); and his obligation to surrender to creditors any claim he may have for damages to the vessel, or the proceeds of any recovery thereon (O'Brien v. Miller, 168 U. S. 287, 303–307, 18 Sup. Ct. 140, 42 L. Ed. 469; Id. [D. C.] 59 Fed. 621; 1 Valroger, Droit Mar. p. 327, § 271); and the insurers' right of subrogation on the other hand, upon payment of the insurance to the owner, to the same claim, which is also required to be surrendered in the limited liability proceeding, produce complex and apparently conflicting relations. But in the case of The City of Norwich, 118 U. S. 468, 506, 6 Sup. Ct. 1150, 30 L. Ed. 134, it is in effect stated that the insurers' right of subrogation is subordinate to the rights of the damage claimants, who must first be paid in full (The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, Adv. S. U. 595, 44 L. Ed. ——); so that the insurers, with the rights only of the as-

sured, take what is left of the indemnity fund after the damage claims are satisfied. Wattson v. Marks, Fed. Cas. No. 17,296; Boul. P. Dr. Com. 203–205. These rules having been observed and followed, I find that the insurance company is entitled to the residue of the fund, subject to the payment of a counsel fee, as above provided.

Decree accordingly.